Filed 7/11/13  In re J.P. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | |
| JOSE G.,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>SUPERIOR COURT,<br><br>        Defendant and Respondent,<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Real Party in Interest. | A138432<br><br>(Contra Costa County Super. Ct. No. J10-01433) |

Petitioner Jose G. (Jose) is the father of minor J.P., who was removed from the care of mother Michelle P. (Michelle) due to neglect.  Jose, who was not married to Michelle and never had custody of his son, sought to have J.P. placed in his care.  The juvenile court ordered the Contra Costa County Children and Family Services Bureau (Bureau) to provide reunification services to Jose.  After over two years of services, the Bureau recommended that J.P. be placed with his father under a family maintenance plan.  On April 11, 2013, rejecting the Bureau's recommendation, the juvenile court terminated

1

services to Jose, and scheduled a hearing under Welfare and Institutions Code section 366.26[1] to consider a permanent plan and termination of parental rights.

Jose now petitions for extraordinary writ relief. Opposition has been filed on J.P.'s behalf. We conclude substantial evidence supports the juvenile court's finding that placing J.P. in Jose's care would create a substantial risk of detriment to J.P.'s safety and well-being. We therefore deny the petition.

## BACKGROUND[2]

On October 1, 2010, police responded to an apartment where Michelle lived with her adult son Mario and six-year-old J.P.[3] Michelle and Mario had been involved in an altercation, and the incident resulted in Michelle's hospitalization on a section 5150 hold. Michelle was supposed to be receiving treatment for mental health problems, but she had not been taking her medications and her behavior had become increasingly bizarre. At the time of the 5150 hold, she had alcohol and methamphetamines in her system. Michelle was released later that same day.

A social worker made an unannounced visit at Michelle's apartment six days after her 5150 hold and found her in a state of dishevelment. J.P. was absent from school that day (apparently a common occurrence), and when asked about his whereabouts, Michelle first lied that he was at school and then that he was at a friend's house. After the social worker called the sheriff's department for officer assistance, Michelle admitted that J.P. was sleeping inside the apartment and allowed the social worker and deputies to enter. The apartment had a "very strong negative odor" and the carpet was "heavily stained," "sticky," and "disgusting." Wet toilet paper and rags littered the bathroom floor and the hallway outside the bathroom. There were dirty dishes, rotten food, empty bottles, and

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

[2] The only petition before us the one brought by Jose. We thus omit facts concerning Michelle that are irrelevant to the issues before us.

[3] Michelle had another adult son, Orlando, who did not live with her, and two other sons, Armando and Raymond, who lived with their paternal grandparents.

other trash strewn about. A broken ceramic pot was scattered on the living room floor. J.P. was sleeping on a bed in the corner of the living room.

Michelle told the social worker that she stopped taking her medications because she ran out, but one of the deputies found two bottles in a drawer. Michelle acknowledged methamphetamine use, although she denied having a problem and claimed she could stop using at any time.

Mario was home at the time and told the social worker that J.P. needed to get out of there, suggesting that he go live with his aunt. After Mario helped J.P. get dressed, J.P. was taken into temporary custody and placed in foster case. As he was leaving, Michelle told him that it was his fault he was being taken away because he had broken the pot that was in pieces on the living room floor.

The day after J.P.'s removal, the social worker spoke with J.P.'s other adult brother, Orlando, who wanted to be considered a temporary relative placement until J.P. could be placed with his aunt. Orlando provided insight into Michelle's mental health problems, advising that her diagnosis was schizophrenia. She had been drinking more and more lately, and her behavior was out of control because her medication did not mix with alcohol.

The social worker also contacted Jose, who claimed that, up until a month prior, he was seeing J.P. on a regular basis. He had never lived with, nor had he ever been married to, Michelle, and he purportedly knew nothing about her mental health issues or alcohol and drug abuse. Although there was no court ordered child support, he claimed he gave Michelle money to help out. Jose denied having any substance abuse issues of his own, and said that he lived with his wife and their three children, who were 13, five, and two years old.[4]

---

[4] The record refers to Laura R. interchangeably as Jose's wife and partner. Laura testified that she and Jose had never married.

**Section 300 Petition and Detention**

On October 12, 2010, the Bureau filed a section 300 petition alleging that Michelle failed to protect J.P. within the meaning of section (b) because she had mental health, drug, and alcohol problems that inhibited her ability to protect and parent him. The petition identified Jose as the alleged father. The juvenile court ordered J.P. detained the following day.

At a November 18, 2010 hearing, Jose made his first appearance, and the court ordered paternity testing.

**Jurisdiction**

On November 29, 2010, the court sustained the allegations in the petition and took jurisdiction over J.P. It also appointed Orlando as J.P.'s educational representative, and continued the matter to January 3, 2011 for disposition.

**Disposition**

In the Bureau's disposition report, the social worker described J.P. as a "sweet, energetic little boy who enjoys playing and interacting with others." He would sometimes get frustrated when he did not remember or understand things, which would make him angry. J.P. was in kindergarten, and it was suspected that he had some learning delays. The social worker was seeking to have him formally assessed, but in the meanwhile, he was receiving speech services.

According to the social worker, J.P. told her that he was afraid of Laura, his father's partner, because while visiting his dad on one occasion, Laura had choked him because she thought he broke her window.

As to Jose, the social worked advised he had two prior arrests—one in 2002, the other in 2003—for possession of drugs for sale, with one conviction. Jose admitted only one prior arrest, claiming that at the time he was living in a home where drugs were being sold and denying that he was involved in the criminal activity or that he was convicted of any crime. Jose also claimed that his only history of drug use was trying marijuana years ago. This conflicted with Michelle's representation that she used methamphetamines

4

with Jose, as well as a claim by one of Michelle's sons that he had seen Jose give Michelle drugs on more than one occasion.

Jose advised the social worker that he and Laura would like to have J.P. placed in their care, and the Bureau was conducting an assessment to determine the appropriateness of placing J.P. with his father. The social worker was concerned about the appropriateness of such a placement, however, because of Jose's failure to adequately monitor the care J.P. had been receiving from his mother, Jose's own history of possible drug use, and concerns about the relationship between J.P. and Laura. The social worker noted that Orlando had also expressed an interest in caring for J.P., but he did not have a suitable living arrangement at that time.

The Bureau recommended family reunification services for Michelle, with services for Jose as well if he elevated his paternity status to presumed. It also submitted proposed case plans for both parents.

At a January 3, 2011 dispositional hearing, the court ordered reunification services for Michelle, acknowledged Jose as J.P.'s alleged father, and continued the matter to June 20 for a six-month review hearing.

A paternity test subsequently confirmed that Jose was J.P.'s biological father, and his status was raised to presumed father.

**Jose's Section 388 Request**

On March 28, 2011, Jose filed a section 388 request, seeking to change the court's out-of-home placement order. As the nonoffending parent, Jose requested that J.P. be placed with him under family maintenance while he worked to complete his case plan. The court scheduled a hearing on Jose's section 388 request for April 18, 2011, which hearing date was ultimately continued to May 25 for a contested hearing.

Following the contested hearing, the court denied Jose's section 388 request but adopted the case plan for him. It required him to stay sober and show his ability to live free from drugs and alcohol; submit to random drug testing; meet J.P.'s physical, emotional, medical, and educational needs; cooperate with the social worker; successfully

5

complete a parenting class; and demonstrate that he would not permit others to physically abuse J.P. The court maintained the status review date of June 20, 2011.

### Six-Month Status Review

In a six-month status review report, the Bureau updated the court on J.P.'s well-being. J.P. had undergone a neurodevelopmental evaluation, which resulted in a diagnosis of attention deficit hyperactivity disorder (ADHD), inattentive type. It was recommended that J.P. be prescribed a neurostimulant, although his foster mother felt she was able to manage his behavior at home without medication. An occupational therapy evaluation showed significant impairment in J.P.'s ability to complete paper and pencil tasks with control and ability, and resulted in a diagnosis of developmental coordination disorder, with a recommendation that he receive occupational therapy. J.P. had also been diagnosed with a generalized anxiety disorder and was participating in psychotherapy. His therapist was working with him to identify and verbalize his feelings.

J.P. also had academic delays, with below average scores in reading, writing, and math. It was expected that an assessment of J.P.'s eligibility for special education would occur in the fall.

J.P. remained in the same placement he had been since his October 2010 detention, and it was going well. He had developed a close bond with his foster mother and felt safe with her.

As to Michelle's status, the Bureau advised that she continued to suffer from mental health problems and was sporadic in her visits. When she did visit, she failed to recognize appropriate boundaries with J.P. and was often psychotic in her behavior. While it was difficult to know whether her issues were due to mental health issues, substance abuse, or both, her circumstances had not improved since J.P.'s removal, making his return to her care unsafe at that time.

Jose, on the other hand, had been fairly consistent in his visits. He often brought his other three children with him, and they enjoyed playing with J.P. Initially, Jose was minimal in his interactions with J.P., which was possibly attributable to a language

6

barrier.[5] Over the course of numerous visits, however, Jose had become more engaged with his son and was developing a parental bond. Likewise, J.P. was becoming increasingly enthusiastic about visits with his father.

Despite Jose's progress, the Bureau still had many of the same concerns about placing J.P. with him, concerns that, according to the Bureau, Jose failed to acknowledge or understand. Despite having tested positive for methamphetamine (in May 2011), as well Michelle's statement that she has used drugs with him and two arrests and a conviction for possession of narcotics, Jose continued to deny ever having used drugs. He also had not acknowledged J.P.'s fear of Laura, or addressed it with J.P. The Bureau recommended that reunification services be extended for both Michelle and Jose, with the social worker concluding as follows: "This worker has tried to help [Jose] recognize that J.P. needs more from him as a parent than the basics he is used to providing; transporting to and from school, taking him to the park, etc. It remains to be seen whether [Jose] will be able to meet J.P.'s distinct developmental, educational, and emotional needs."

At a six-month review hearing on June 20, the court continued reunification services for six months and set a 12-month review hearing for December 5, 2011.

On October 20, 2011, the Bureau filed an ex parte application requesting authority to approve up to thirty consecutive overnight visits for Jose. According to the social worker, both J.P. and Jose were requesting overnight visits, they were doing very well in their family therapy sessions, and their therapist was supportive of overnights.[6] The Bureau also advised that Jose was compliant with his case plan, participating in random drug testing with negative results since May 26 and actively participating in a substance abuse treatment program. The court granted the request.

---

[5] Jose spoke primarily Spanish, while J.P. spoke primarily English.

[6] Around this time, social worker Barbara Crespo took over J.P.'s case from the prior social worker. As will be seen, Crespo would later testify at the contested hearing that concluded with the termination of reunification services for Jose.

**12-Month Status Review**

In a 12-month status review report prepared in November 2011, the Bureau recommended that the court continue services to Jose but terminate them as to Michelle. While Michelle was not drug testing nor participating in a substance abuse treatment plan, Jose remained compliant with his case plan. He and J.P. were also participating in family therapy, the sessions were going well, and Jose was engaging in positive ways with his son.

The Bureau advised the court that J.P. was doing well in his foster home and had begun overnight visits with his father in October. Earlier in November, however, the Bureau had received information that Jose hit his younger children and used inappropriate words toward his oldest child. The Bureau opened an investigation and suspended J.P.'s overnight visits. J.P. had recently reported that he liked being with his father and half-siblings and that he got along with Laura and was not afraid of her, but it was unclear from the Bureau's report whether J.P. had expressed those sentiments before or after the Bureau opened its investigation.

J.P. was otherwise doing well. He had started on medications for his ADHD but experienced negative side effects. His pediatrician suspected that he may have bipolar disorder and depression, rather than ADHD, so he was being referred for psychological and psychiatric evaluations. He was eligible for special education services due to an auditory processing learning disorder, and he was participating in individual and family therapy.

The 12-month status review hearing did not take place on December 5 as scheduled, and was continued first to January 12, 2012, and then to February 27.

In a memorandum prepared prior to the February 27 hearing, the Bureau advised the court that J.P. was continuing to have weekly unsupervised visits with his father, but did not want overnight visits, so there had been none since November 2011. Jose had completed his substance abuse treatment program, was continuing to attend 12-step meetings, and was participating in random drug testing with negative results. He was no longer participating in family therapy, however. According to the therapist, he was not

8

committed to the process and exhibited a lack of priority when it came to therapy, possibly due to cognitive deficits that were affecting his ability to benefit from the therapy.

At the February 27 hearing, the court continued the matter to March 5 for a contested hearing.

In its status report for the March 5 hearing, the Bureau advised the court that J.P. was doing well in his foster placement and continued to have weekly visits with his father, although he still did not want overnight visits. J.P. indicated that he did not want to live with his father, because he did not feel safe with him and Laura. He expressed a desire to live with his older brother Orlando, who also desired to care for J.P., but did not have a suitable living arrangement.

The Bureau further advised the court that although family therapy had been terminated in January, Jose otherwise remained in compliance with his case plan. Nevertheless, it did not believe that placement of J.P. with Jose was safe. It expressed a concern that Jose had some cognitive delays that might interfere with his ability to, and understanding of how to, parent J.P. In the Bureau's opinion, Jose did not fully understand that J.P. was a child with special needs who required specialized services. The Bureau thus recommended terminating reunification services to Jose and continuing J.P. in foster care with a goal of permanent placement.

A contested hearing was held on March 5, at the conclusion of which the court terminated family reunification services for Michelle. As to Jose, however, the court did not follow the Bureau's recommendation, instead extending reunification services for him. It then continued the matter to April 5, 2012 for an 18-month review hearing.

**18-Month Status Review**

On March 29, 2012, licensed clinical social worker Marynella Woods submitted a report to J.P.'s counsel advising, as pertinent here: "At your request I conducted another home visit and assessment of your eight year old client, [J.P.] Prior to your request, I received a phone call from the foster mother, Lydia [S.], stating that she was concerned about the deplorable condition of [J.P.'s] clothes when he returned from visits with his

9

father.  As you know, for some time now [J.P.] has not wanted to visit with his father, much less live with him.  He had complained that his father was cruel to the family pets, and physically abusive to the other children in his home.  The social worker reportedly investigated the situation and decided that [J.P.'s] allegations were unfounded, so the visits have continued.  [The social worker] also commented that part of the problem is that [J.P.] is 'too attached to the foster mother.'  Frankly, I find this comment to be disturbing because what we hope for with these kids is that they *can* attach in a healthy way.  The fact that [J.P.] is attached to Ms. [S.] is a good thing, and has certainly been a catalyst for the progress he has made thus far. . . .  [I]f the Department is planning on making any moves for this child, the father is not an appropriate placement.  [J.P.] is simply too emotionally vulnerable, and even with the gains that he has made, still has a long way to go."  Wood recommended a slow and progressive transition to Orlando's home.

The court held a contested hearing on May 14, 2012.  Following the hearing, the court found extraordinary circumstances, ordered another six months of reunification services for Jose, and continued the matter to August 13, 2012 for a 24-month review.  It also ordered Jose to attend parenting classes, and approved increased visitation during the summer.

### 24-Month Status Review

Prior to the August 13 hearing, the Bureau filed a status memo advising the court that Jose and Laura had completed parenting classes and continued to want J.P. to live with them.  J.P. was still having weekend visits.

The social worker also advised that she attempted to increase overnight visits, but these visits were not supported by J.P.'s counsel or his foster mother.  According to the foster mother, J.P. was tearful at the prospect of being with his father, and she expressed concern about the quality of care J.P. received while at his father's home, including worries about hygiene and the cleanliness of the house.  J.P. had told her that his father does not let him brush his teeth or take showers.  The social worker spoke with Jose, however, who stated that J.P. did bathe when he was there, and that Jose and Laura made

10

sure he and his clothes were clean. The social worker noted that she had visited Jose's home and found it clean and comfortable.

The August 13 hearing was continued to August 20 and again to October 29, 2012. Prior to the October 29 hearing, the Bureau submitted a status report recommending that J.P. be placed with his father with a family maintenance plan and that Orlando be released as J.P.'s educational representative.

The Bureau advised that J.P. was doing well in his foster home and that his basic needs were being met. He was receiving special education services and twice-weekly tutoring, and his process in school was satisfactory. He was only taking Benadryl, his foster mother having stopped the psychotropic medications when she noticed he was having memory problems and was very slow to respond.

According to the Bureau, J.P. was able to meet his personal care needs with assistance and reminders, although he was easily distracted and had problems staying focused. He continued to participate in psychiatric services that included medication monitoring and individual therapy. The Bureau quoted J.P.'s therapist as noting that although the "foster mother has become very attached to J.P. and has been a strong advocate for him, it is difficult to determine how much she influences what he is thinking and feeling, particularly in regard to his relationship with his biological father. J.P. has made great progress under her care and she should be applauded for her efforts. However, the therapist is always aware that he must carefully weigh what J.P. says with the filter of how much is this influenced by the foster mother."

Jose remained in compliance with his case plan, consistently testing negative for drugs, and Jose and Laura had completed a parenting program. According to Jose, J.P.'s siblings loved being with J.P., and they all wanted him to live with them.

Concerning visitation, the Bureau noted that J.P had regular unsupervised visits with his father and recently had an extended weekend visit as well as a seven-day visit. The social worker visited J.P. during each visit, and observed him to be very comfortable with his family and laughing and playing with his siblings. J.P. related having had a good time during each visit, and did not express any fear or discomfort.

11

The Bureau concluded with this assessment: "[J.P.] has done well in his current placement. His extended visits with his father have gone well. The father and his wife made the effort to take [J.P.] to his sport activities and ensured he kept his appointments. [J.P.] indicated to this worker that he had a nice time with his family and he did appear to be comfortable in their presence. [¶] [Jose] remained consistent with his interactions with [J.P.] He completed all that the Bureau and the Court asked of him. He has consistently drug tested negative since June 13, 2011. He participates in the educational meetings for [J.P.] and is open to do whatever is needed to have his son with him permanently." With that, the Bureau recommended that J.P. be placed in his father's care under a family maintenance plan. It also requested that Orlando be released as J.P.'s educational representative.

In an undated caregiver information form (but apparently submitted in advance of the October 29 hearing), J.P.'s foster mother advised the court that J.P. "gets very angry and emotional each and every weekend when he has to go with his dad. Says he will run away, he cries, yells." An attachment described multiple complaints or incidents that purportedly occurred between May and October 2012, including: J.P. came home from a visit and complained that his father threw him into the water even though J.P. was still learning how to swim; J.P. reported that his father and half brother swore extensively; J.P. complained that he hates sleeping at his father's because all four children had to sleep in the same room and he often had to share a bed with his young half brother; J.P. reported that his father and half siblings often spoke derogatively about his foster mother; J.P. told his foster mother that his father held cockfights in the backyard; J.P. cried at a doctor's appointment because his father had not recognized J.P. in the hallway until J.P. was standing right in front of him, raising concerns about Jose's eyesight and the safety of him driving J.P. in a car; J.P had a nightmare about Laura putting her hands around his neck; J.P. cried because his young half brother told him their father said he would shoot Orlando if he got custody of J.P.; and after a visit, J.P. told Orlando that his father "smacked him on the head" because he let one of their dogs lick him on the face.

12

Also attached to the caregiver form was a letter from J.P.'s pediatrician, who described her interaction with J.P. at a recent appointment, as follows: "He was very emotional during the visit and cried readily. He and his foster mom shared with me that he had actually seen his biological father at the clinic that day. His father actually did not recognize him when he saw J.P. I asked J.P. how he felt about living with his father and his family. He told me that he did not want to live with biological father. Upon further questioning, he said that his step-mother tried to choke him. I tried to ask more about this incident but J.P. did not want to discuss it further."

At the October 29 review hearing, counsel for J.P. contested the Bureau's recommendation, and the matter was set for a contested hearing.

On November 14, 2012, J.P.'s foster mother, Lydia, filed a de facto parent request, which the court granted on January 7, 2013.

**24-Month Contested Review Hearing**

A contested hearing took place over the course of three days, February 13, March 14, and April 11, 2013. J.P. was the first to testify. He expressed concerns about living with his father because his father frequently used swear words, often yelling "bitches" at his half-siblings, and he would hold, as J.P. called them, "chicken fights" in the backyard where upwards of 30 people would come and place bets. When asked if anyone in the house hit him, J.P. said that his father did on one occasion when he was petting one of the family dogs. J.P. also did not like his father's house because the kitchen and bathroom were infested with cockroaches. According to J.P., Jose never requires him to shower and, in fact, sometimes prevents him from doing so. If he had his choice, J.P. would live with Orlando.

J.P. acknowledged that he had been visiting his father frequently lately, including regular Saturday and Sunday visits and overnights. When asked if they had been going well, J.P. responded, "Kind of." As to what he did when visiting his father, J.P. testified he watched television, played outside, went to the park, and walked the dog.

13

J.P. also testified that even though his father's house has four bedrooms, he shared a bed with his 14-year-old half sister.[7] His two younger half siblings slept in the same room as Jose and Laura, and the remaining two rooms were vacant.

When asked about the incident when Laura purportedly choked him, J.P. testified that he did not remember it ever happening, nor did he remember telling his pediatrician about it. He answered "no" when asked if he was afraid of Laura, but stated that he was "sometimes" afraid of his father, because he hit him on the head one time when J.P. was petting his dog in a cage, which Jose did not like. J.P. described another time when his father hit him on his hand when one of the dogs licked his face.

Jose was the next witness to testify. In response to questioning, he was unable to identify what grade J.P. was in, the name of his teacher or pediatrician, the names of his medications, or his medical diagnoses.

Jose acknowledged having had four chickens at one point, but testified that he had given them away on the orders of the city because they crowed early in the morning.[8] He denied ever having cockfights or any other similar event.

Concerning his prior conviction for possession of drugs for sale, Jose claimed that he had been living with people who were selling drugs but he got blamed for it. He spoke up about it, and the police later found out who really did it. And he claimed he was previously unaware of his positive drug test "because I don't use drugs."

Jose testified that he and Laura had completed two parenting classes in which they learned how to talk to and educate children. He had also been participating in random drug testing pursuant to which he submitted to tests every week or two, all of which had come back negative.

Jose denied that he had ever hit J.P., claiming that whenever J.P. needed disciplining, he just gave him a "talking to." When asked what sort of bad things J.P. had done, Jose described a recent incident when J.P. put a knife to his younger half sister's

---

[7] It is unclear from the testimony at the hearing whether J.P. actually shared a bed or just a bedroom with his sister.

[8] J.P. likewise testified that they no longer had chickens.

14

head.  Another time, J.P. hit another child hard with a ball.  Jose never told the social worker about either incident.  Jose also denied knowing what "the B word" is.

Jose affirmed that he and Laura both wanted J.P. to come live with him.  He was paying $25 in child support each week, and he understood the payments would stop if J.P. lived with him.

Concerning the sleeping arrangements, Jose confirmed that J.P. slept in the same room as his teenage half sister.  When asked why he did not sleep in his own room, Jose explained that he previously had the two spare bedrooms rented out, and he was looking for new tenants.

When asked about the cockroaches, Jose admitted "there are some but not too many."  He had "put a lot of bombs and all that" in attempts to exterminate them.

As to J.P.'s hygiene, Jose explained that he would tell J.P. to shower, but he often arrived with tattoos and "painted hair," which he did not want to shower off.  According to Jose, J.P.'s foster mother was the one who told him not to shower at his father's house because the tattoos and paint would wash off.

Jose understood that J.P. was having learning problems and that he was also in need of therapy.

Barbara Crespo, who had been the social worker assigned to J.P.'s case since September 2011, then testified.  She was aware of Jose's one positive drug test, as a result of which he attended an outpatient substance abuse program, 12-step meetings, and random drug testing.  Crespo acknowledged that family therapy was stopped in January 2012 due to Jose's lack of participation and issues of possible cognitive deficits that affected his ability to benefit from therapy.  She also acknowledged that, according to the therapist, Jose exhibited a lack of priority when it came to therapy and he was not committed to the process.

Crespo testified that she had explained J.P.'s diagnoses to Jose, but that he did not appear to understand what they were.  He did, however, describe behaviors in J.P. that were consistent with his diagnoses.

15

Crespo had not heard about the knife incident prior to that day. Jose had told her, however, that J.P. was acting out towards his siblings and was hitting them.

Crespo estimated that she had visited Jose's home five times in 2012. Whenever J.P. was there for an extended visit—typically, seven consecutive days—she had made a point of visiting when Jose was going to be there with J.P. She also visited him at his father's house right before Christmas, and she visited on two additional Saturdays. Although she had personally observed the presence of cockroaches, she had no concerns about the general cleanliness of Jose's house. When she did the initial home assessment, Jose showed her the bedroom where the children slept, and there were three beds in it. She was not aware that J.P. and his teenage half sister were sharing a bed. At the time of the initial assessment, the family had one dog and some chickens. During later visits, the chickens were gone and they had more dogs, although none appeared vicious.

When she did the initial assessment, Crespo interviewed all adults who lived in the home, including one of Jose's tenants. She was going to do a background check on the tenant, but he passed away before it was completed. Crespo did not believe that her initial home assessment reported to the court that there were other adults living in the home.

According to Crespo, Jose had participated in three meetings concerning J.P.'s school learning plan. He had a general understanding that J.P. has cognitive delays, although she suspected he did not understand the severity and the long-term effect of it. Laura had also attended the meetings, and she seemed to comprehend the issues better. Crespo also suspected that Jose did not fully understand J.P.'s emotional issues. The Bureau's recommendation that J.P. be turned over to Jose's care with a plan for family preservation services would include months of family therapy in the home to help the whole family adjust to the new living arrangement.

When asked if the foster mother understood J.P.'s educational needs, Crespo responded that she and the foster mother had different opinions about J.P.'s academic needs. The foster mother (as well as J.P.'s brother Orlando) wanted him to be in a smaller educational setting, while Crespo believed J.P. was doing well where he was. It

16

was not, in her opinion, a matter of changing the school environment as much as it was finding a way for him to retain the information he was learning.

When asked if she had an opinion as to where J.P. felt safer, Crespo responded: "I know what he said to me. He stated that he feels better with Lydia or his brother. I also know what he's told the psychiatrist. But bottom line, [Jose] hasn't given up on his son. He stuck it out all this time. He is a non-offending parent. And it doesn't seem—kind of like, I really need to give him the opportunity to be the parent that he can be, him and his wife working together to bring this child into their family and make the family whole, but I know that [J.P.] does not want to be with his father."

Laura, Jose's partner, was the next to testify. She and Jose had been together for 16 years, although they never married. They had three children together, who were four, seven, and 15 years old at the time of the hearing. Other than the two parents, three children, and J.P. on most weekends, no one else lived in the house.

Laura testified that there were times when she was home with J.P. and she found him difficult to direct, particularly on the first day of a visit. After the first day, he typically behaved better. She described a recent incident during a surprise birthday celebration for J.P. when he exhibited a bad attitude toward her, smearing her with cake. They had spent a lot of time preparing for the party so J.P. would have a good time, and his behavior reduced her to tears.

Laura was aware that J.P. participated in therapy because he had difficulty remembering things and, as she put it, "he has a bit of trouble with his character." She also acknowledged that J.P. had misbehaved towards his younger brother recently, and she was concerned about his behavior towards her children. When asked if she thought she would treat J.P. differently from her three children if he was placed in their home, she answered, "There has never been a difference. I don't know why there would be one afterwards." She was not aware that if J.P. were returned to their home, someone would come three to five times a week to help integrate J.P. into the family. Testimony then concluded for the day.

17

When testimony resumed nearly a month later, Crespo was recalled to the stand. Since the previous court session, Crespo and counsel for J.P. spoke about J.P. having an extended visit with his father, which they agreed would be a good opportunity to see how J.P. would react. A week-long visit was scheduled to correspond to J.P.'s spring break, but on the day the visit was set to begin, Laura called Crespo and advised that one of her young children was very sick and they were on the way to the emergency room. Since no one would be home to greet J.P., the visit was canceled, and it ended up being reduced to a single overnight visit.

Counsel for J.P. examined Crespo about a visit report prepared at the request of J.P.'s counsel. In the report, an investigator stated that she found the living room furnished but dirty; the kitchen in complete disarray, with food, unwashed dishes, and cooking utensils piled on every available surface; bedrooms filthy with little furniture and piles of clothes, toys, and personal items strewn about a bathroom that was also filthy and strewn with towels and other personal items. Crespo testified that that was inconsistent with how she had ever found the home, on both announced and unannounced visits.

J.P.'s counsel asked Crespo if she had considered Jose's lack of understanding of J.P.'s needs in making her recommendation that he be placed in his father's home. She did not think he was incapable of understanding J.P.'s needs, and that they had spoken about the services that J.P. was receiving and would continue to receive. As to whether she had considered any negative impact on J.P. in transferring him from the foster home where he was then living, Crespo testified that she did not see a negative impact other than that he did not want to be there. She did concede, however, he would be affected by breaking the bond he shared with his foster mother, and it would be destabilizing to separate him from Lydia, just as it would be for any child. That was why, she added, the family would receive services to help with the transition.

Counsel for the Bureau then questioned Crespo on the portion of the report describing the condition of the house. According to Crespo, Jose called her the Monday after the investigator's Saturday visit. He told her a person had shown up and wanted to take J.P. for a walk, which he would not allow because he does not let his children walk

18

off with strangers. He did let the woman in the house, explaining to her that the home had just been fumigated, which was why belongings were moved around and piled on top of each other.

Counsel then asked Crespo about the minimum standard of care for parents. She testified that the parent needs to meet the child's basic needs. As far as housekeeping goes, it means a safe home where the child is not in danger, does not have access to chemicals, and has a bed; there is a minimum of three days of food in the refrigerator; and there is hot and cold running water and working toilets.

Crespo also testified that she believed the foster mother was reluctant to allow J.P. to reunify with Jose. Crespo explained that when that is the case, the Bureau would typically move the child to another placement. According to Crespo, that was not done here because Lydia was very good when it came to managing J.P.'s doctor's and therapy appointments, and Crespo wanted to maintain that for J.P. And once Lydia became the de facto parent, Crespo felt she was unable to move J.P.

Lydia was the final witness to testify. She had been J.P.'s caretaker for over two and a half years. When he first came to live with her, J.P. had no medications, no eyeglasses, and was not potty trained. He was subsequently diagnosed with ADHD, posttraumatic stress, and insomnia. Since that point, he had been prescribed approximately five different psychotropic medications, all of which Lydia tried but ultimately stopped because of his reaction to them. At the time of the hearing, J.P. was only taking Benadryl to help him sleep, Albuterol for asthma, and Claritin for allergies. He would shortly be starting a new psychotropic medication to help him focus and pay more attention.

Lydia testified that she had been attending all of J.P.'s educational meetings. Because J.P. was behind academically, he had tutoring twice a week at home, and she also read to him or gave him extra homework.

As to his visits with his father, J.P. has told Lydia that he did not feel safe. When asked about J.P.'s particular concerns, Lydia related that the house was unclean, Jose's friends came over and they hung around outside drinking, and nobody cooked for him.

19

After visits, J.P. would return to her house and be very quiet, telling her about the things that happened during the visits, such as he slept in a dirty bed, he could not sleep in his bed because it was piled with clothes, and he was not given enough food to eat.

Concerning hygiene matters, Lydia described how J.P. loved to take showers, brush his teeth, and wash his face. When he returned from his father's house, he was often wearing the same clothes he had worn over there, which were by then very dirty, and he was unbathed.

Lydia also testified that in June 2012, J.P. told her about a cockfight he witnessed at his father's house. Lydia also testified that J.P. told her about being attacked by a pit bull outside his father's house, although when J.P. testified, he did not recall the incident.

Jose was recalled to the stand to answer questions about the investigator visit that had occurred since his original testimony. According to Jose, the investigator arrived unannounced on a Saturday when Jose was home alone with J.P. and his younger half brother. Jose testified that the night before the visit, the house had been sprayed for cockroaches, and the family had not yet returned all of their belongings to their rightful places.

Closing arguments began with counsel for J.P. arguing that he would be detrimentally affected if the court followed the Bureau's recommendation. He would lose the security he had in Lydia's home, and in turn he would be placed in a home where he did not feel safe. Counsel further argued that the Bureau's recommendation was financially motivated because it would no longer have to pay for his foster care.

Counsel for Jose argued that while there was testimony J.P. did not feel safe at his father's house, he never identified concrete examples of what made him feel unsafe. Counsel noted that while the case was still in family reunification, Lydia was advising that she wanted to adopt J.P., which was premature at that point. Because of her bias, counsel opined that J.P. was being coached to say he did not like it at Jose's house, giving only examples of uncorroborated incidents such as the cockfights and people hanging around in the backyard drinking. He concluded with this: "[T]he father has done everything he's been required to do under the [family reunification] plan. He deserves a

20

chance, an opportunity, I think Ms. Crespo said it herself, to show that he can parent this child. If he can't—and we're not talking about a dismissal. If he can't, then the [Bureau] will come back in and [J.P.], I have no doubt, will be removed and probably put back with [Lydia]. [¶] But this is really jumping the gun because the caretaker wants to adopt him. And she's done a good job for him, but we're not at that point yet in this case. And so I think policy of the law favors reunification. And to allow the caretaker to step in and say, 'Well, I can be a better parent. Let's forget reunification even if the parent has done everything he can to reunify,' I think that should not be condoned."

Counsel for the Bureau argued last, contending that the care J.P. was receiving in the foster home, as argued by counsel for J.P., was irrelevant to the question before the court, which was whether there was detriment to J.P. in placing him in Jose's home. As counsel put it, under section 366.22, the court was "required to return the child to the custody of the parent unless it determined by a preponderance of the evidence that the return of the child would create a substantial risk of detriment to the child's physical or emotional well being. . . . The standard for showing detriment is fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from reunification services as mentioned . . ., seems less capable than any available foster parent or other family member. Rather, the risk of detriment must be substantial such as returning a child to parental custody represents a danger to the child's well being or physical or emotional well being."

Counsel noted that Jose had appeared in the case from the very beginning seeking custody of J.P. and had "done his case plan. He has done everything that the Department has asked of him. He has tested negative for 18 months. He has had the child in his home. He does not treat the child differently than his other children." And she reiterated that if J.P. were placed with his father, the Bureau would provide family preservation services to assist with the transition. J.P. also had additional support in place, as he has access to his brothers and a mentor with whom he had an ongoing relationship.

Following argument, the court terminated reunification services to Jose, offering the following rationale:

21

"I think there has been a showing by more than preponderance of the evidence that return—not even return—to place J.P. with the father at this time would create a substantial risk of detriment to his emotional well being.

"I have gone back—I have reviewed the documents that I have stated on the record. I have gone back and reviewed the testimony on the prior dates. I note that the father when he testified he didn't know what grade J.P. was in, he didn't know the name of his teacher. He didn't know why J.P. needed the medication he was taking or even what the specific medication was. He didn't know who the doctor is. He had absolutely no comprehension of any academic challenges or emotional needs that he can describe to the court.

"Furthermore, and I don't think it's all that insignificant, is when you look at this case and you have to take each case as they come, this child has been through a really horrific childhood and [Jose] was not much part of that childhood. And the part that he was, according to statements of the older brother, were not very good parts of the childhood including supplying and participating in ingesting drugs with the mother in this case.

"And I went back and I was a little bit surprised, but in March of 2012, it was actually recommend[ed] that services to dad be terminated. And Commissioner Houghton overruled that and ordered no [*sic*] more services. And then you come back in October and now it's the recommendation that [J.P.] be removed from the caretaker and placed with father, for the first time in his life to live with his father and there has absolutely been no change in circumstances since the March recommendation and the October recommendation.

"The father still doesn't grasp the issues. He denies that he has ever used or participated in drugs. He's been convicted of trafficking in drugs and tested positive, and he states he doesn't know why he possibly could have tested positive to those drugs. He has shown absolutely no insight into his own issues, let alone this child's issues.

"And the fact that they don't even speak the same language is just—given this big picture before this Court, I'm not sure why [Lydia] has become the villain in this.

22

Because there is no evidence before this Court that she has done anything to sabotage any of these relationships, period. Everyone can surmise that these are statements of [J.P.] that she is reporting. These are not her statements. And the fact that she has been an active advocate on his behalf, I think she should be applauded for that and not made to be someone who is developing a relationship that never existed between [J.P.] and his father.

"The Court hopes that there will be a positive relationship at some point between [J.P.] and his father, but the Court does not believe there is one now such that the court would be willing to place [J.P.] for the first time in his life with a dad given the issues that [J.P.] presents. And this is not about who's the better caretaker. It's about this boy who appears in this courtroom with all of his issues.

"So I cannot go along with the recommendation in this case for the reasons that I have stated. And it has nothing to do with cockroaches, and it has nothing to do with taking showers at caretaker's home and putting deodorant on. Those are great things, but that's not what the Court is looking at. I'm looking at the emotional well being of this little person in the courtroom."

With that, the court set the matter for a section 366.26 hearing on August 8, 2013.

On April 17, Jose filed a timely notice of intent to file writ petition. Opposition to Jose's petition was filed on behalf of J.P. The Bureau took no position.

## DISCUSSION

Section 366.22, subdivision (a) provides that at periodic review hearings, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." In reaching its decision, the court "shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of the services provided." (*Ibid.*)

In announcing its decision, the juvenile court here found that placing J.P. in Jose's care would create a substantial risk of detriment to his emotional well-being. We review

23

the court's findings for substantial evidence (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1326), and we conclude substantial evidence supported the court's order terminating reunification services to Jose.

J.P. was a vulnerable child with many special needs. He had been diagnosed with ADHD and general anxiety disorder, although his therapist suspected he had bipolar disorder and depression. He took medications for various ailments, including Albuteral for asthma, Claritin for allergies, and Benadryl to help him sleep at night. More significantly perhaps, J.P. had tried multiple psychotropic medications to treat his psychiatric disorders, but had experienced negative side effects. It was expected that he would be trying another psychotropic medication in the near future. Despite these significant health concerns, Jose could not identify J.P.'s various diagnoses, nor did he know what medications he took or the names of his doctors. And, according to Crespo, when she explained the diagnoses to Jose, he did not appear to understand.

J.P. also needed various forms of therapy to help him cope with his numerous issues. Despite this, family therapy had been terminated because Jose was uncommitted to the process and failed to make it a priority, evidencing a lack understanding of, and commitment to, J.P.'s emotional needs. Indeed, Crespo testified that, in her opinion, Jose did not fully understand J.P.'s emotional issues.

As to J.P.'s educational needs, he had learning challenges for which he was receiving special education services. Despite this, Jose did not know what grade his son was in, nor could he name his teacher. And, again, Crespo testified it was her opinion that while Jose had a general understanding of J.P.'s cognitive delays, he did not understand the severity and the long-term effect of them.

While J.P. testified that he enjoyed the company of his half siblings, a sentiment that the evidence suggested was mutual, there were two recent incidents in which J.P. acted aggressively towards the two younger half siblings. Due to these, and possibly other, incidents, Laura testified that she was concerned about J.P. living in the home she shared with Jose and their children.

24

And, lastly, and most certainly not insignificantly, J.P. expressed fear at the prospect of living in his father's home. Although he testified he did not remember a choking incident, there was evidence in the record that, at some point in the past, Laura had placed her hands around J.P.'s neck. J.P. also expressed fear of his father, testifying that he had struck him twice, once on the hand and once on the head. And J.P. describes other problems at his father's house that made him uncomfortable, such as the excessive swearing, the cockroach infestation, the sleeping arrangements, and the lack of sufficient food.

All told, this evidence portrayed a child who had significant psychiatric, emotional, and academic challenges. In the two and half years since removal from his mother's care, J.P. had made notable progress in many of these areas. But, without a doubt, he remained fragile with much progress yet to be made. In light of all this, the juvenile court's conclusion that placing J.P. in Jose's care would create a substantial risk of detrimental to his emotional well-being was supported by the substantial evidence detailed above.

Jose argues, as the social worker represented and the Bureau's counsel argued at the hearing, that he did all the Bureau and the court asked of him. But the decision whether to return a dependent child to the custody of a parent—or, as here, to place a child with a noncustodial parent—is not governed solely by whether the parent has completed his or her case plan. (*Jennifer A. v. Superior Court, supra,* 117 Cal.App.4th at p. 1344 ["the decision whether to return a dependent child to parental custody is not necessarily governed solely by whether the parent has corrected the problem that required court intervention."].) For example, in *In re Joseph B.* (1996) 42 Cal.App.4th 890, 893, Joseph was detained because his parents were physically abusing him. By the time of the 18-month status review, the parents had completed their case plan and eliminated the problem that lead to their son's removal. (*Id.* at pp. 900-901.) Nevertheless, because Joseph had been emotionally scarred by the abuse and was traumatized by the prospect of being returned to his parents' custody, returning him posed a grave risk of detriment to his emotional well-being such that return to parental custody was improper. As the Court

25

of Appeal put it, "If returning the child will create a substantial risk of detriment to his or her physical or emotional well-being [citations], placement must continue regardless of whether the detriment mirrors the harm which had required the child's removal from parental custody [citations]." (*Id.* at p. 894.)

The situation here is similar. J.P. was removed from his mother's care due to neglect arising out of mother's mental health and substance abuse problems. Jose, the noncustodial parent, sought placement of J.P. and completed all components of his case plan. But, as in *In re Joseph B., supra,* 42 Cal.App.4th 890, compliance with his case plan was not the sole determinative factor. The court was still tasked with determining the effect of the placement on J.P.'s well-being, and as we have held above, there was substantial evidence supporting the court's determination that J.P.'s placement in his father's care would have placed J.P. at a substantial risk of detriment.

We conclude with the observation that this is a close, and difficult, case, made so because Jose made admirable strides during the reunification period in completing his case plan and developing a father-son bond with J.P. While there was substantial evidence that the circumstances fell short of those required to have J.P. placed in his care, we trust that at the next stage, when the court selects a permanent plan pursuant to section 366.26, all involved will carefully consider Jose's conduct.

**DISPOSITION**

The petition of father Jose G. for extraordinary writ relief is denied on its merits. (Cal. Rules of Court, rule 8.452(h)(1).) This decision is final as to this court forthwith. (*Id.*, rule 8.490(b)(1).)


                                                   _____

                                                   Richman, J.


I concur:


_____
Haerle .J.

**Kline, P.J., Dissenting.**

The trial court's finding that placing J.P. in his father's care would create a substantial risk of detriment to the child's emotional well-being is not in my view supported by substantial evidence. Accordingly, I respectfully dissent.

Because " '[t]he relationship of a natural parent and a child is a vital human relationship which has far-reaching implications for the growth and development of the child' " (*In re Andrew L.* (2004) 122 Cal.App.4th 178, 195), dependency law is designed to protect it from state interference absent a compelling need to do so. As many courts have explained, "[t]he dependency scheme is based on the law's strong preference for maintaining family relationships whenever possible. [Citations.] When a child is removed from parental custody, certain legal safeguards are applied to prevent unwarranted or arbitrary continuation of out-of-home placement. [Citations.] Until reunification services are terminated, there is a statutory presumption that a dependent child will be returned to parental custody. [Citation.]" (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)

Where as here, the trial court rejects the determination of the social services agency that releasing the minor to his father would *not* "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child" (Welf. & Inst. Code, § 366.22, subd. (a)), the burden of showing such a "substantial risk" devolves on the court. "That standard, while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.) Regrettably, these improper lesser standards seem to me the ones that have been very unfairly applied.

What we have in this case is a nonoffending and loving father who has reached out to protect his son from dangers created by the mother and done all that has been asked of

1

him. Is he perfect? Certainly not, but neither are most parents, and "[w]e do not get ideal parents in the dependency system." (*David B. v. Superior Court, supra,* 123 Cal.App.4th at p. 789.)

The trial court's assessments of the facts seem to me unjustified by the whole record; particularly the court's statement that there is not now a "positive relationship" between Jose and his son, which I think a gross distortion of the parent-child relationship reflected in the record. The court's statement that Jose and his son "don't even speak the same language" significantly overstates the case and is, in any case, a questionable criterion. Most importantly, I think the trial court's assessment of the relevant facts is unbalanced and therefore unfair. Fairly considered, the entire record simply does not establish the "substantial risk" needed to support the trial court's ruling.

I am also troubled by the trial court's statement that "there is no evidence before this Court that [the foster mother] has done anything to sabotage any of these relationships, period." That observation seems to me utterly blind to the record. I cannot confidently say the foster mother has in fact "sabotaged" the relationship between Jose and his son, but the record provides (and the majority opinion describes) more than enough evidence to warrant that inference.

While I dissent, I join the majority in hoping that, at the next stage, when the court selects a permanent plan pursuant to Welfare and Institutions Code section 366.26, the court and all others involved will more carefully consider the father's conduct. I hope too that the court will keep in mind the high value the law places on the relationship of a natural parent and a child, and that it is not the judicial role to compare the resources or quality of care a parent can provide against those that can be provided by a foster parent desirous of adopting the child.

2

For the foregoing reasons, I would reverse the judgment.


_____
Kline, P.J.

3